Jimmie McBEE, et al.,
Plaintiffs-Appellees,

v.

JIM HOGG COUNTY, TEXAS, et al.,
Defendants-Appellants.

Javier Alfonso HINOJOSA, et
al., Plaintiffs,

v.

JIM HOGG COUNTY, TEXAS, et
al., Defendants.

No. 81–2465.

United States Court of Appeals,
Fifth Circuit.

April 25, 1983.

Opinion on Granting of Rehearing En Banc
Aug. 12, 1983.

Before GARZA, REAVLEY and GAR-WOOD, Circuit Judges.

GARZA, Circuit Judge:

On January 1, 1981, Gilbert Ybanez, the newly elected sheriff of Jim Hogg County, Texas, assumed office, retaining one of his predecessor's deputies and one of his predecessor's dispatchers. Pursuant to 42 U.S.C. § 1983, five former employees—three field deputies and two dispatchers—bring this consolidated action contending that Sheriff Ybanez's personnel decisions unlawfully abridged their first amendment rights under the political patronage cases of *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); and *Tanner v. McCall,* 625 F.2d 1183 (5th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981) (*see also Barrett v. Thomas,* 649 F.2d 1193 (5th Cir. 1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982)), as well as other related first amendment cases, *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); and *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) which prohibit firings taken in retaliation for protected first amendment conduct. After a bench trial, at which Sheriff Ybanez testified extensively, the district court concluded (1) that the sheriff's failure to retain dispatcher Stephanie Spencer and sheriff deputies—Javier Hinojosa, Onofre Serna and Joel Contreras —were, in each instance, the result of unlawful political motives, and (2) that the sheriff's failure to retain dispatcher/secretary Jimmie McBee constituted unlawful retaliation for her exercise of protected first amendment rights.

Richard R. Gonzales, Hebbronville, Tex., for defendants-appellants.

Rick Fancher, Corpus Christi, Tex., Pope, Guerrero & Reed, Roger Reed, Rio Grande City, Tex., for plaintiffs-appellees.

*Facts*

We begin by examining the facts of this case. In Texas, the qualified voters of each county elect a sheriff every four years; he, in turn, is empowered to appoint deputies (the exact number varying from county to county depending on population and the policies of each county's commissioners' court). At present, the sheriff of Jim Hogg County can appoint six field deputies, four dispatchers and three custodians.

Approximately 140 miles south of San Antonio, with a population of less than 6,000, Jim Hogg County, like much of Texas, has long been a Democratic party stronghold. In substance, if not in form, its local public officials are actually chosen in Democratic party primaries (often, as was true here, running without even nominal opposition in the general election).

In May 1980, the defendant Gilbert Ybanez won the Democratic primary election for Jim Hogg County sheriff, defeating the incumbent, Juan Ramirez, and two other candidates. Ybanez ran on a platform which in part promised the voters "a change" in administration. His election followed a customarily vigorous campaign in which each candidate's supporters vied for votes among friends and relatives, and participated in the traditional campaign parades and rallies (called "pachangas") held to promote the candidates. With the possible exception of Jimmie McBee (whose differing situation we consider below) all five plaintiffs in some way supported former sheriff Ramirez. Three (Hinojosa, Serna and Contreras) campaigned actively on his behalf.

Ybanez was elected sheriff without opposition in November. Prior to assuming office in January, Ybanez did not solicit applicants for deputy positions publicly, nor did he have any formal written application procedure. Instead, he chose prospective sheriff's department employees solely on the basis of informal oral applications and private interviews. Ybanez elected to retain one field deputy, one dispatcher and the three custodians from the staff of his predecessor. A position as dispatcher only was also offered another member of the prior staff.

This method of initial hiring of one's staff conformed to the longstanding and well established county practice recognizing the new sheriff's complete discretion in the selection of his staff. This meant that a new sheriff could reject all of his predecessor's deputies if he wished to bring in his "own people," obtaining, also by custom, the automatic approval of the Commissioner's Court. This was precisely what the defendant chose to do.

■ In late December Sheriff Ramirez advised his staff by letter that they should assume that their employment would terminate with the expiration of his term of office on December 31, 1980, unless they were personally contacted by the sheriff-elect and advised otherwise. This action was consistent with Texas law which provides that a sheriff's staff serves at the pleasure of the sheriff and that their tenure concludes when such official leaves office. Tex.Civ.St.Ann. art. 6869 (Vernon 1960). Except for a brief meeting prior to taking office, Ybanez did not otherwise discuss his staffing plans with Ramirez in any way. It is to be noted that none of the plaintiffs reapplied to Ybanez for continued employment prior to their statutory dismissal, nor were they contacted by the new sheriff, except for Mrs. McBee.

The situation of Mrs. McBee and the theory upon which her suit is premised is somewhat different from those of the other plaintiffs. At the time of her non-retention, Mrs. McBee was chief dispatcher, secretary and jailor for Sheriff Ramirez. Unlike most of her fellow deputies, she appears to have taken little personal part in the effort to reelect Sheriff Ramirez, and in fact, her husband's family were active Ybanez supporters in the primary election. In late December, she was contacted by Ybanez, and they met at her home, at which time she was offered a position at a reduced overall salary (from $630.00 to $550.00 or less a month). The position of sheriff's secretary, she was told, had already been promised, but Ybanez told her that she

could continue as a dispatcher and that he would like her to train his new secretary. McBee protested the unfairness both of Ybanez's offer and of his plan to fire her fellow employees. She neither accepted nor rejected his offer and apparently acceded to his request that she keep his plans confidential for the time being. At the beginning of the week following their discussion, McBee telephoned Ybanez to renew her protests, and to advise him that she felt the dispatchers had a right to know they were about to lose their jobs. Soon after, McBee and dispatcher Spencer visited two members of the Commissioner's Court, Jaime Gomez and County Judge Romeo Vasquez, in hopes of obtaining advice or assistance in their effort to dissuade Ybanez from carrying out his plan to restaff the office. In response to these visits, Ybanez withdrew his employment offer to McBee.

At trial, Ybanez admitted that the persons he employed after January 1, 1981, were no more qualified than the people they replaced. He admitted that he did not know plaintiff Spencer or anything about her qualifications, and he advanced reasons to justify the non-retention of plaintiffs Hinojosa, Serna and Contreras, which the district court found unpersuasive.

As to plaintiffs Hinojosa, Serna, Contreras and Spencer, the trial court held (1) that Sheriff Ybanez's failure to reappoint them was the result of unlawful political motivation within the meaning of *Branti, Elrod,* and *Tanner;* (2) that Sheriff Ybanez failed to show that he would not have retained the plaintiffs in the absence of his political reasons; and (3) that Sheriff Ybanez failed to show that the nature of the plaintiffs' positions were such that partisan political loyalty was a bona fide job qualification entitled to recognition as an exception to the general rule of *Elrod* and *Branti* prohibiting political patronage discharges.

As to plaintiff McBee, the trial court, relying on *Mt. Healthy City Board of Education, Perry v. Sinderman,* and *Givhan,* held that her protests to Commissioner Gomez and Judge Vasquez regarding Sheriff Ybanez's plans to fire the Ramirez staff

were not lawful grounds for dismissal, and that she had "established a cause of action for violation of her first amendment rights":

> Although McBee's case does not bring her squarely within the *Elrod-Branti* doctrine, she has nevertheless established a cause of action under the similar, related doctrine that a public employee cannot be fired in retaliation for exercising her constitutional right to freedom of speech.

On appeal, the defendants attack the factual conclusions of the district court and the adequacy of the evidence upon which such conclusions were based. Certain legal issues are also raised. We, therefore, turn to appellants' contentions and the applicable law upon which this case is based.

*Elrod-Branti: Principles and Analysis*

In *Elrod v. Burns, supra,* the Supreme Court held that patronage dismissals of public employees—that is, discharging employees on a partisan political basis—infringe first amendment interests. In *Elrod,* Republican sheriff's office employees were discharged or threatened with discharge after a Democratic sheriff assumed office, solely because they were not members of or supportive of the Democratic party. The Court held that the Constitution proscribes discharge of non-civil service employees solely because they did not support and were not members of the political party of the newly elected sheriff or because they had failed to obtain the sponsorship of the leaders of that party. 427 U.S. at 351, 96 S.Ct. at 2678–2679. The holding of *Elrod,* however, was limited by the concurring opinion of Justice Stewart who believed the case could be resolved on a more conservative ground that a "nonpolicymaking, nonconfidential government employee" could not be discharged from a job that he was satisfactorily performing, upon the sole ground of his political beliefs. *Elrod v. Burns, supra,* 427 U.S. at 374–75, 96 S.Ct. at 2690–2691 (Stewart, J., concurring).

In *Branti v. Finkel, supra,* the Supreme Court held that nonpolicymaking, nonconfidential assistant public defenders,

appointed by a Republican public defender, could not be terminated by the newly appointed Democratic public defender solely on the ground of their political beliefs. The Court found that unless the government could demonstrate an overriding interest of vital importance requiring that a person's private beliefs conform to those of the hiring authority, his beliefs could not be the sole basis for depriving him of continued public employment. 445 U.S. at 515–16, 100 S.Ct. at 1293–1294. The burden rests upon the hiring authority to demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved. *Id.* at 518, 100 S.Ct. at 1294–1295.

In *Tanner v. McCall, supra,* this court set forth a three-step inquiry to assess whether a plaintiff should prevail under the *Elrod-Branti* rationale. That inquiry is as follows:

(1) Assuming plaintiff's allegations are true, was the defendant's conduct an impermissible infringement of First Amendment freedoms?

1. Appellants do not challenge the district court's finding that the rule and rationale underlying the *Elrod-Branti* doctrine applies when an employment decision is based upon support of and loyalty to a particular candidate as distinguished from a political party. In *Tanner v. McCall, supra,* we acknowledged without deciding this identical question. In this regard, we set forth the reasoning of the district court which under the present set of facts we find persuasive:

Having found sufficient proof of Plaintiffs' allegations, this Court must now revert to step one of the analysis and confront the critical issue which the *Tanner* court was able to sidestep. That is, does the *Elrod-Branti* rationale apply when employment decisions are based upon support of and loyalty to an individual politician as distinguished from a political party? The Court has concluded that the answer is affirmative. In so doing, the Court first takes note of the evidence that in Jim Hogg County, as a practical matter, all final political decisions are made within the confines of the Democratic primary election. There is no viable Republican party at that level and therefore securing the nomination of the Democratic party is tantamount to election. Indeed, the Court could take notice that such a scenario until quite recently was generally true throughout most

(2) Has plaintiff proved his allegations?

(3) Has defendant rebutted plaintiff's showing by proving that the plaintiff would not have been retained in any event, for reasons apart from his constitutionally protected conduct.

625 F.2d at 1190. Using this same format, we now turn to the contentions raised by the appellants.

### Constitutional Infringement: The Small County Situation

■ Assuming plaintiffs' allegations that they were dismissed because they had supported Sheriff Ramirez rather than Sheriff Ybanez were true, the district court found that plaintiffs' first amendment rights had been infringed. In so holding, the court addressed and cleared two possible hurdles in its path. First, the court found that dismissal because of one's political loyalty to a particular candidate, as opposed to a political party, raised similar first amendment concerns.[1] Defendants have not pursued this holding on appeal. Second, the court found that Ybanez' expressed interest

parts of Texas and other states of the old Confederacy. *See Terry v. Adams,* 345 U.S. 461 [73 S.Ct. 809, 97 L.Ed. 1152] (1953). In that context, any patronage system or political discrimination based on Democrat-versus-Republican loyalties would be largely irrelevant. All of the political "action" thus involves individual Democrats, or groups thereof, fighting each other for power in the Democratic primaries. In this setting, to limit the application of *Elrod* and *Branti* to discrimination based only on party alliance would be not only making a distinction without a difference but would essentially negate those holdings at least in Jim Hogg County and similar settings.

We agree with the district court that the *Elrod-Branti* rule is applicable in cases such as this. In *Elrod,* Justice Brennan's plurality opinion focused upon the broad spectrum of political patronage practices. While his plurality opinion must be interpreted conservatively in light of the narrower concurrence of Justice Stewart, *Branti*'s reaffirmance of the *Elrod* principle does not suggest that the court intended its disapproval of political patronage to extend only to opposing political party situations, particularly when the exact same practice has occurred within the same party in a one-party county.

in hiring loyal employees did not outweigh "the plaintiffs' interest in freedom from unnecessary restraint on their beliefs and associations." In this regard we consider one ground for reversal which the defendants inartfully contend is presented by the present factual situation. The defendants appear to argue that the small size of the Jim Hogg County sheriff's office and the agency relationship created by Texas law between sheriffs and their deputies, as well as other unspecified factors made partisan political affiliation vital to the effectiveness and efficiency of the sheriff's office. Accordingly, defendants contend that the plaintiffs' positions are of the type which fall within the "policymaking, confidential" exception to the *Elrod-Branti* rule. The district court concluded "that the size differential is not alone a sufficient factor to change the result in this case." In the context of a large sheriff's department with more than 700 employees, including some 550 deputies, this court previously rejected the argument that a sheriff's deputies fell within the *Elrod-Branti* exception for confidential, policymaking employees. *Barrett v. Thomas, supra,* 649 F.2d at 1201. We now consider whether the size of the sheriff's staff presents a situation different from that which we examined in *Barrett.* In so doing, we consider the legal relationship of the sheriff and his deputies as well as the distinguishing factors presented in the small county situation.

In *Tanner v. McCall, supra,* we addressed the nature of the sheriff-deputy relationship stating:

A deputy is the sheriff's alter ego and has all the sheriff's sovereign powers, except the power to appoint other deputies. A deputy's actions are those of the sheriff and the sheriff is civilly liable for those actions.

625 F.2d at 1186. The deputy sheriff in a small county, unlike one of some 550 assistants in a larger county, possesses a much more significant role in the community as a member of law enforcement. Unlike the large office where one's duties may be limited to the specialized functions associated with the numerous divisions in an office of such size, the small county deputy performs virtually all the duties attendant to the actual duties of the sheriff himself. His functions are highly discretionary and more than "the simple exercise of ministerial competence." *See Newcomb v. Brennan,* 558 F.2d 825, 830–31 (7th Cir.), *cert. denied,* 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977); *Cf. Francia v. White,* 594 F.2d 778, 782 (10th Cir.1979). Each of his actions, as varied as they may be, represent the implementation of policies of the sheriff's department as a whole.

It is not uncommon in the small community for a candidate to seek the office of sheriff on a platform espousing "a change." These "changes" are reflected by the very attitudes and actions of the very few officers whom the new sheriff has the power to appoint. The candidate is elected by voters who fully expect and demand such "changes" to be made. "[T]he freedom of voters to structure their representative government," *see Branti v. Finkel, supra,* 445 U.S. at 534, 100 S.Ct. at 1303 (Powell, J., dissenting), is a substantial governmental interest seriously infringed in the small county situation if a newly elected sheriff was unable to make a "change" by replacing those few deputies viewed by the voting public as the "alter ego" of the administration just voted out of office.

Any elected official is responsible for employing those individuals whose actions will ensure that his policies are carried out. *Newcomb v. Brennan, supra* 558 F.2d at 830–31. The decisions of those individuals should conform to the broad objectives which the elected official chooses to pursue. *Id.* In the small county situation, the need for confidence in one's employees is heightened since an official must rely on perhaps six, as opposed to six hundred, officials to carry out his objectives. Such is even more apparent in the law enforcement area where a sheriff's deputies are often called upon to make on-the-spot split-second decisions effectuating the objectives and law enforcement policies which a particular sheriff has chosen to pursue. The need for

confidence and loyalty in one's employees—particularly where so few are involved in a position of heightened public scrutiny—is paramount. If a sheriff in a small county questioned his confidence in and the loyalty of his six-man staff of deputies, the ability of such an office to effectively perform its duties would be severely hampered. Moreover, should an "open rift" ever develop between a sheriff and his deputies—"even if the basis for the feud were unrelated to actual job performance"—the office would become nothing more than "a battleground in which little was accomplished, to the detriment of the citizens . . . ." *Newcomb v. Brennan, supra.* The absence of loyalty of deputies to the sheriff, but rather to another candidate, has been found to create "an atmosphere of tension, distrust and suspicion within the office" so as to make the government's interest in "promoting the efficiency of the public service it performs through its employees" outweigh first amendment concerns. *Serna v. Manzano,* 616 F.2d 1165, 1166 (10th Cir.1980). Such actions may be "disruptive and interfere[ ] with the efficient operations of the Sheriff's office." *Id.* at 1167.

One can surmise that the statutory scheme in Texas in which a deputy sheriff serves at the pleasure of the sheriff and only during that sheriff's tenure of office was enacted in part to recognize the need for loyalty within the sheriff's staff. In *Murray v. Harris,* 112 S.W.2d 1091 (Tex.Civ. App.—Amarillo 1938), writ dism'd, the court stated:

> Article 6869 of the Revised Statutes 1925, as amended by Acts 1929, 1st Called Sess., c. 113, § 1, Vernon's Ann.Civ.St. art. 6869, gives to sheriffs power, by writing, to appoint one or more deputies for their respective counties, to continue in office during the pleasure of the sheriff, and extends to deputies so appointed the same power and authority as to official acts and duties as that which is possessed by their principals. . . . Appointment of

such officers therefore involves the public welfare which, no doubt, was in the minds of the legislators when they made provision that such deputies should hold their offices during the pleasure of their principals. By including such provision in the law, the Legislature established a public policy to the effect that officers elected by the people to discharge public trusts and upon whose shoulders rests the responsibility for their proper discharge should be free to select persons of their own choice to assist them in the discharge of the duties of their offices.

*Id.* at 1093. Where employees serve at the pleasure of a public official, a high level of personal accountability to that official can be presumed. *Owens v. Rush,* 654 F.2d 1370, 1376 (10th Cir.1981).[2] This high level of personal accountability is "consistent with the highly sensitive and confidential nature of the work which deputies perform as well as with the considerable powers of the deputy to represent the [official] in the eyes of the public." *Id.* citing *Ramirez v. San Mateo County,* 639 F.2d 509, 513 (9th Cir.1981). Thus, a high degree of accountability, such as that which exists under Texas law, equates with the confidential relationship of a sheriff deputy's employment. Furthermore, such accountability raises the public's view of deputies as representatives of the sheriff thereby increasing the necessity for loyalty in that position. These matters are exacerbated in the small county situation where only six deputies are employed to account to the sheriff and represent him publicly.

In *Barrett v. Thomas, supra,* we held that the Texas sheriff of Dallas County, as in the case of the Chicago sheriff in *Elrod,* was subject to liability for political dismissal of deputies of the former sheriff; and we rejected arguments that the Texas system of reappointment somehow insulated the Texas sheriff's office from *Elrod-Branti.* A majority there held that the facts supported

---

**2.** *Owens v. Rush* was decided in the context of judicially interpreting the otherwise undefined meaning of the "personal staff" and "policy-making" exceptions to the term "employee"

pursuant to Title VII, specifically 42 U.S.C. § 2000e(f). Although not precisely on point, we find the court's discussion analogous for purposes of our discussion here.

the trial jury's finding that "the constitutionally protected political activities or associations of Barrett and the plaintiff class were motivating factors" in the firing sheriff's personnel decisions. However, in rejecting the Dallas sheriff's further suggestion that his deputies were within the confidential, policymaking employees excepted under *Elrod,* our court stated:

> In a sheriff's department with more than 700 employees, including approximately 550 deputies, the absence of political cohesion between sheriff and deputy can hardly be said to undermine an intimate working relationship. The rule of *Elrod v. Burns,* not the exception, applies here.

649 F.2d at 1201. Unlike *Barrett,* in the small county sheriff's department with merely six deputies, the sheriff may well work closely on a personal and confidential basis with his staff. The "absence of political cohesion between sheriff and deputy" may indeed be shown "to undermine an intimate working relationship." Accordingly, the exception of *Elrod* is much more implicated.

Furthermore, the present situation differs from that in *Branti* where only a nine-man public defenders office was involved. In *Branti,* the "primary, if not only, responsibility of the assistant public defender" was to represent individual citizens in controversy with the state, *Branti v. Finkel, supra,* 445 U.S. at 519, 100 S.Ct. at 1295, a situation far different from that of the deputy sheriff whose loyalty is to his employer, the sheriff. Indeed, the Supreme Court noted this contrasting situation expressing no opinion as to whether an assistant district attorney could be dismissed on grounds of loyalty. *Id.* at 519 n. 13, 100 S.Ct. at 1295 n. 13. In *Stegmaier v. Trammell,* 597 F.2d 1027 (5th Cir.1979), this court recognized that trust, confidence and undivided loyalty, where shown to be legitimate considerations necessary to maintaining and properly performing a public position, were factors which may indeed bring a particular position within the *Elrod* exception. *Id.* at 1040.

Finally, in a case which expressly addressed the issue before us, the Fourth Circuit was equally persuaded that the atmosphere in the small county sheriff's office was distinguishable from that presented in *Elrod* (and similarly presented to us in *Barrett* ):

> In this connection, we take notice of the intimate relationship that undoubtedly exists between the sheriff and his deputies in a small county like Lee County, Virginia. The efficient operation of the sheriff's office in Lee County requires a high degree of mutual cooperation, confidence and support. None of these elements is likely to be present where the parties are bitter political antagonists. By contrast, the relationship between the sheriff and his deputies in the large Cook County, Illinois office is likely to be far more impersonal.

*Ramey v. Harber,* 589 F.2d 753, 756–57 (4th Cir.1978), *cert. denied,* 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979); *Accord, Ramey v. Harber, supra,* 589 F.2d at 761 (Hall, J., concurring) (*Elrod* inapplicable because, *inter alia,* "the nature and size of the Lee County Sheriff's Office necessitates mutual confidence and co-operation, which is unlikely to exist where members of the office have actively opposed each other in a bitter election campaign.") Although the authority of *Ramey* may be somewhat weakened since its primary holding was that *Elrod* did not apply retroactively to the nonreappointments in question, the court's reasoning is persuasive authority for the proposition that the need for loyalty, trust and confidence may be such as to implicate the *Elrod-Branti* exception in the small county sheriff's office where only a limited number of positions are available to the sheriff who has exclusive power to hire and dismiss his staff.

We believe it is possible for a sheriff in a small size office to make a plausible argument that his law enforcement staff falls within the *Elrod-Branti* exception. In Jim Hogg County, the sheriff's law enforcement staff included positions for only six deputies and four dispatchers. These few

individuals were responsible for ensuring that the sheriff's policies were properly implemented and enforced. Furthermore, these individuals in their official capacity were representatives of this sheriff to the public. The evidence revealed that sheriff's deputies were involved in virtually every law enforcement activity, usually acting alone without supervision, during twelve hour shifts, making on-the-spot decisions implementing the sheriff's policies. The sheriff, his deputies and dispatchers worked in the limited confines of a small office which physical size was such that work had to be performed closely on a personal and confidential daily basis. The nature, size and physical layout of the office was such that its efficient operation required "a high degree of mutual cooperation, confidence and support." *See Ramey v. Harber, supra,* 589 F.2d at 756–57. Indeed, we find it difficult to imagine how such an office could have effectively carried out its vitally important duties in the public trust when the sheriff did not have absolute confidence in his small staff of deputies and dispatchers. In this case, the interests of the citizens who "needed [and] wanted a change" supercede. We believe the evidence in this case supports a finding that the plaintiff deputies and dispatchers fall within the *Elrod-Branti* exception.

### The District Court's Findings

Our holding that plaintiffs in this case fall within the *Elrod-Branti* exception assumes, of course, under the *Tanner* inquiry, that plaintiffs' allegations that they were fired for exercise of their political beliefs and associations are true. Our holding today, however, need not rest solely under this constitutional analysis. We turn, therefore, to the final two steps of the *Tanner* inquiry to determine whether plaintiffs proved their allegations and whether defendant Ybanez would have nevertheless dismissed them. In this respect, appellants attack a number of findings of fact and conclusions of law based upon those findings of the district court. We have reviewed the record and the district court's findings subject to the "clearly erroneous"

standard of review, and we find merit to appellants' argument.

The district court's conclusion that plaintiffs were fired for "political" reasons is flawed in several respects. For example, the court was persuasively influenced by its finding that:

Some time after his election, but prior to January 1, 1981, defendant Ybanez spoke with Sheriff Ramirez and told him to advise all existing employees of the Sheriff's Department that they would no longer be employed by the Sheriff's Office after January 1, 1981, unless they had been personally contacted by Ybanez. Ramirez sent a letter to each employee, advising of that fact.

The court's finding that Ybanez ordered the letter of termination to be sent to the plaintiffs is clearly erroneous. Upon questioning by the court itself, Ramirez testified that *prior* to his meeting with Ybanez, he (Ramirez) drafted a letter to his employees informing them that their employment would end with his term of office. The following day, Ramirez met very briefly with Ybanez to inform him of his actions. This was the only meeting which Ramirez could recall. Ybanez thus never ordered the plaintiffs' dismissals; rather, the record reveals that the letter upon which plaintiffs so vigorously relied was actually the sole creation of former sheriff Ramirez himself.

After reading the entire record as a whole, we are also left with the "firm conviction" that the district court erred in the emphasis it placed on Ybanez' "expressed interest in hiring loyal employees." Sheriff Ybanez made no attempt to hide the fact that he wished to hire individuals "loyal" to him. We are convinced, however, that the loyalty sought by the new sheriff was not loyalty in the "political" sense. Ybanez' testimony reveals that political affiliation had little if anything to do with his employment decisions. For example, he was totally unaware of which candidate the plaintiffs in this action supported. His lack of awareness stemmed both to those plaintiffs who supported Ramirez as well as those who supported Ybanez himself in the prior

election. Additionally, the sheriff admitted that "political loyalty" was not a factor necessary to a deputy's effective performance of his job. Furthermore, Ybanez either rehired or offered to rehire almost fifty percent of his staff from the previous administration (6 employees for 13 positions). Indeed, of the mere two deputies from the prior staff who requested reemployment (prior to January 1, 1981) in the Ybanez administration, the new sheriff hired one.

We are further troubled by the district court's finding that the reasons offered by the defendant for declining to reappoint the former deputies were merely "pretextual *afterthoughts*" (emphasis added). The record reveals that Ybanez was well aware *prior* to taking office and *prior* to appointing his full staff of various factors he perceived to be deficiencies in the officers' records which he contended influenced his decision. The record further reveals that Ybanez informed at least two of the three deputies of his nonpolitical, performance-related reasons for not rehiring them at the first opportunity which arose to do so.

For example, with respect to Deputy Hinojosa, Ybanez stated that his decision not to rehire was based on an incident in which a man had been shot as Hinojosa and a partner attempted to arrest him. Ybanez was aware of the incident shortly after it occurred approximately one year before his election. Furthermore, Ybanez had studied the district attorney's file on this matter during November and December of 1980, prior to taking office and before his full staff had been appointed, and concluded that Hinojosa might be "trigger happy." Moreover, the first opportunity to discuss this matter with Hinojosa apparently did not arise until Hinojosa sought reemployment in January, 1981, after the new sheriff's staff had assumed office. At this instance, Ybanez, according to Hinojosa's own testimony, candidly informed him that he was not rehired because the "town needed, wanted a change, and that he [Ybanez] had some complaints about me [Hinojosa]." These complaints concerned the shooting incident described above. We are pressed to see the "pretextual afterthought."

With respect to Officer Serna, two incidents colored Sheriff Ybanez' decision not to reappoint him. Both involved shooting incidents: one in which Serna shot the minor driver of a vehicle which had ignored Serna's attempts to stop the vehicle and another in which Serna had withheld information to the sheriff and district attorney's office concerning a shooting incident by border patrol agents in which Serna had been involved. Again, the record establishes that Ybanez was acquainted with the two incidents and had studied the district attorney's investigatory file on both. As in the case of Hinojosa, Serna did not request reemployment to his position until after the new sheriff's staff had assumed office in January, 1981. At this time, however, Ybanez informed Serna that the positions were promised (or filled) and that he did not wish to reemploy him due to various complaints he had received. Again, we fail to see the "political" motivation behind these actions.

With respect to Officer Contreras, Ybanez decided not to reemploy him primarily because Contreras, according to the new sheriff, had difficulty speaking loudly due to an incident in which he had been shot in the throat while working as a sheriff's deputy and because of a steel plate which was implanted in Contreras' skull as a result of an injury received in Vietnam. Ybanez expressed remorse at this decision but nevertheless acted since it was he who would be responsible for the actions of his employees. Indeed, Ybanez testified that he offered to employ Contreras in an office job at a later time. Again, these actions are not consistent with a political motive for dismissing one's employees.

Finally, with respect to dispatcher Stephanie Spencer, the record is similarly without facts to support a finding that she was fired in violation of *Elrod-Branti*. Sheriff Ybanez candidly testified that he did not know Spencer and that he did not know who she supported in the election. Spencer herself admitted that she was minimally involved in any campaign which, of course, would be requisite to a finding that she was

dismissed for exercising her first amendment right to support another candidate. Other than placing a bumper sticker on her car, Spencer did not actively support any candidate in the sheriff's election. Furthermore, the record reveals that Spencer never reapplied for a position on the new sheriff's staff. Indeed, Ybanez did not become aware of her intention to seek reemployment until after Ybanez assumed office and was notified by an attorney for Spencer that she wished to be rehired. On this record, we cannot say that Spencer established her *Elrod-Branti* claim.

Our reading of the record convinces us that the "loyalty" which Ybanez sought from his employees was loyalty in the sense of individuals whom he personally felt he could rely upon in the effective performance of their duties. This is a far cry from "political loyalty."

■ *Elrod-Branti* did not create tenure; although a sheriff generally cannot dismiss an employee for exercising his first amendment right to freely associate, neither must he take on the burden of showing that new employees are somehow objectively as qualified or more qualified than the old. To do so is to effectively create tenure. As we have previously discussed, in the small county situation, the personal loyalty of a few number of deputies is a factor which may uniquely be necessary to the effective performance of one's job. The record evidences no other conclusion than one in which Ybanez felt that the individuals he hired were such that he could place greater reliance upon and confidence in them to effectively perform their duties. As subjective as this factor may be, it is a factor which does not give rise to first amendment concerns as, for example, one's party affiliation did in both *Elrod* and *Branti*.

■ We emphasize that non-tenured public employees have no property right in their job, nor are constitutional rights affected by their firing without cause, except in the *Elrod-Branti* situation. Here, under Texas law, each sheriff can appoint his staff, with a term to expire with his. The principles of *Elrod-Branti* do not hold that, once appointed, a sheriff's deputy has lifetime tenure, unless the reappointing authority discharges him for cause or perhaps upon the difficult showing that some new appointment is better qualified than the experienced deputy now fired.

■ Our review of the record leaves us with the "firm conviction" that Ybanez' decision not to rehire the plaintiffs was not shown to be based upon the plaintiffs' exercise of their right to freely associate and support another candidate. Indeed, Sheriff Ybanez testified that he did not even know who plaintiffs had supported. Furthermore, the record does not support the district court's conclusion that Ybanez' nonpolitical reasons for nonreappointment were merely "pretextual afterthoughts." In the language of *Tanner v. McCall,* we do not believe that plaintiffs proved their *Elrod-Branti* allegations. Moreover, we are even more convinced that defendant would have so acted for reasons totally unrelated to constitutionally protected conduct.

### McBee's Claim

Finding no meritorious *Elrod-Branti* claim with respect to plaintiffs Hinojosa, Serna, Contreras and Spencer, we need only consider the case of dispatcher Jimmie McBee. At the outset, we note that McBee did not establish a meritorious *Elrod-Branti* claim, nor did the district court so find. The evidence showed that Ybanez did in fact offer McBee a position as dispatcher which he subsequently revoked. His reasons for rejecting his previous offer are clearly reflected in the record. As the district court stated, "Ybanez testified without equivocation that McBee's [protests to county officials] were the sole and only reason that he then withdrew his previous offer of employment." Based on this finding the district court determined that plaintiff McBee was dismissed in retaliation for the exercise of her first amendment right to free speech.

■ In a series of cases, the Supreme Court has held that a public employee may not be dismissed for the exercise of his constitutional right of free speech. *See, e.g., Givhan v. Western Line Consolidated School District, supra; Mt. Healthy City Board of Education v. Doyle, supra; Perry v. Sinderman, supra; Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Such right, however, is not absolute. *Pickering v. Board of Education, supra,* 391 U.S. at 568, 88 S.Ct. at 1734–1735. A threshold inquiry into the establishment of a first amendment claim involves a determination of whether the government employee's speech is in fact constitutionally protected. Such inquiry re-

quires the court to "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

On at least two occasions, the Supreme Court has recognized that an employee's statements which interfere with the "close working relationship" between employer and employee are factors to be considered in evaluating the State's interest, as an employer, in maintaining efficient operations. *Givhan v. Western Line Consolidated School District, supra,* 439 U.S. at 414–15 & n. 3, 99 S.Ct. at 696 & n. 3; *Pickering v. Board of Education, supra,* 391 U.S. at 569–70, 88 S.Ct. at 1735–1736. To some extent, the absence of such a close working relationship led the Supreme Court in *Pickering* to conclude that the teacher's criticisms of the school board were constitutionally protected statements. While indicating "some of the general lines along which an analysis of the controlling interests should run," the Court stated:

> The [teacher's public] statements [were] in no way directed towards any person with whom appellant· would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning.

391 U.S. at 569–70, 88 S.Ct. at 1735–1736. The Court's discussion about the possible adverse effect of the teacher's statements on the employment relationship and the need for confidence and loyalty in such a relationship were factors cited to with approval in *Givhan.* Implicit in these decisions is the proposition that criticisms by an employee about his immediate employer in instances where the nature of the employment requires a close or confidential working relationship on a one-to-one type basis may not be subject to first amendment protection because of the state's own interest in effectively performing its public duties.

This circuit, on several occasions, has recognized this principle. Most recently, in *Bowen v. Watkins,* 669 F.2d 979 (5th Cir. 1982), this court adopted the views set forth in *Hoopes v. Nacrelli,* 512 F.Supp. 363 (E.D. Pa.1981) that statements injurious to a close working relationship may indeed be unprotected by the first amendment. *Bowen v. Watkins, supra,* 669 F.2d at 986 n. 11. In *Hoopes,* testimony against the mayor by the police chief was found to interfere with the close working relationship between the officials, a relationship which the court noted depended on confidence and trust. Accordingly, the chief's statements were found unprotected. In still other cases, this court has recognized that certain statements interfering with the employment relationship may fall within the narrow field of statements whose first amendment protections are outweighed by legitimate or compelling state interests. *See, e.g., Truly v. Madison General Hospital,* 673 F.2d 763, 767 (5th Cir.1982); *Abbott v. Thetford,* 534 F.2d 1101 (en banc), *rev'g and adopting dissenting opinion,* 529 F.2d 695, 707 (5th Cir.1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977); *Ferguson v. Thomas,* 430 F.2d 852, 859 (5th Cir.1970).

■ We have previously noted that the need for confidence and loyalty between the sheriff and his law enforcement staff in Jim Hogg County was paramount. We have also noted the close working relationship on a daily basis which existed there. In addition to her position as dispatcher, McBee was also assigned the duty of training the incoming secretary to the sheriff. The need for confidentiality and cooperation in performing this assignment is on its face paramount. McBee's statements to the county officials criticizing her new employer were the type of statements which could only seriously injure her employment relationship with the sheriff. Indeed, Ybanez, in dismissing McBee, concluded that she might be a sort of "troublemaker" that he would obviously be unable to work beside. It certainly was not unreasonable for the sheriff to want a ten-man staff which he believed could work together harmoniously. We believe these interests are significant, and the statements of McBee which could only destroy the close working relationship vital to the performance of her job are ultimately unprotected.

*Conclusion*

Having resolved all issues in the appellants' favor, the judgment of the district court is hereby reversed and remanded with instructions to enter judgment for defendants.

REVERSED.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, GARZA, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.