Glen DOVE, Bobby Breda, McHenry Jackson; Paul Anders; Terrel Delphin; Ronald Coleman; E.L. Moss, Jr.; Victor Jones, Jr.; Dewitt Braxton; Robert Morgan; Asher Vandenburg; James Darnell; Lonnie Shields; Loyd Benjamin; Charles Roge; Clarence Noel and Boyd Durr

v.

Norman FLETCHER, Individually and as Sheriff of Natchitoches Parish, Louisiana.

Civ. A. No. 81–1149.

United States District Court, W.D. Louisiana, Alexandria Division.

Nov. 9, 1983.

---

Thomas M. Yeager, Alexandria, La., for plaintiff.

Grove Stafford, Jr., Alexandria, La., and Ronald Corkern, Natchitoches, La., for defendant.

NAUMAN S. SCOTT, Chief Judge.

## RULING

This matter is before us on a Motion for Summary Judgment by the defendant pursuant to F.R.C.P. 56(b). We entertained oral argument on September 19, 1983. Upon consideration of counsels' arguments, their briefs, and the recent case of *McBee v. Jim Hogg County*, 703 F.2d 834 (5th Cir.1983), and finding there are no genuine issues of material fact, we grant the defendants' Motion for Summary Judgment.

## FINDINGS OF FACT

Natchitoches Parish is a rural and agricultural area located in central Louisiana. It covers 1300 square miles and has a population of approximately 40,000 persons. This parish, like other Louisiana parishes, holds an election every four years to fill the office of sheriff. Because the parish is a Democratic stronghold, the ultimate outcome of a General Election depends upon a Primary Election within the Democratic Party.

A Primary Election for sheriff was held in October, 1979. In that election, Norman Fletcher ran against Boyd Durr, Chief Deputy of the incumbent sheriff, Sam James, who had served for four terms (16 years) but chose not to seek reelection. Several of James' deputies, including the plaintiffs, assisted in Durr's campaign. They donated money, painted campaign signs, affixed bumper stickers to their cars, and held a barbecue on Durr's behalf. Some deputies more actively supported Durr than others. Following the primary election, Fletcher was declared the winner. He was also victorious in the General Election and assumed office on July 1, 1980.

Prior to actually taking office, Fletcher had to make personnel decisions with respect to appointing deputies and an office staff. He had several informal meetings with John Manning, a former aide to Congressman Huckaby, and Herman Bridges, an experienced law enforcement officer. They discussed the merits of individual deputy sheriffs employed in James' office. Fletcher was concerned with whether the deputy could be loyal to him in carrying out the voters' mandate for change. Other community members and business men were also consulted before Fletcher made any final personnel decisions. Fletcher conducted these interviews and conferences in person. He personally made the choice of who would be retained and who would be denied reappointment.

On or about May 28, 1980, Fletcher posted a letter at the Natchitoches Parish Sheriff's Office advising the current deputies who among them would be recommissioned. James had 31 deputies, more or less, on his staff at that time. Fletcher chose to retain 14 and relieved 17 others. The deputies who were denied reappointment were all appointees of James. (Some had requested reappointment orally). Each supported Durr or someone else in the sheriff's election.

## CONCLUSIONS OF LAW

This action is brought pursuant to 42 U.S.C. § 1983 by 17 deputies who were not retained by Fletcher. They argue that they were not reappointed solely because they did not support Fletcher in the October election. Accordingly, they contend that Fletcher, acting under color of State law, infringed upon their First and Fourteenth Amendment rights to political belief and association.

■ Rule 56(b) and (c) of the Federal Rules of Civil Procedure provide in relevant part as follows:

"(b) *For Defending Party.* A party against whom a claim, counterclaim, or crossclaim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

"(c) *Motion and Proceedings Thereon.* ... the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

Stated another way, summary judgment is proper only if there exists no genuine issue of material fact. The burden of proof, therefore, falls on the party seeking summary judgment, and any doubts as to the existence of a fact must be resolved in favor of the non-moving party. *Keiser v. Coliseum Properties, Inc.,* 614 F.2d 406, 410–411 (5th Cir.1980).

The plaintiff contends that summary judgment is not appropriate here because

of two allegedly triable issues of fact: (1) Whether the deputies' commissions expired prior to Fletcher's assuming office, and (2) Whether the failure to reappoint them was politically motivated.

With respect to the first issue, reasonable men could not differ on the resolution of whether the deputies' commissions expired prior to Fletcher's assuming office. In fact, this amounts to an issue of law. See, *Doyle v. Bethlehem Steel Corp.*, 504 F.2d 911, 913 (5th Cir.1974), citing *Orozco v. State Farm Mutual Automobile Ins. Co.*, 360 F.Supp. 223 (S.D.Fla.1972), *aff'd* 480 F.2d 923 (5th Cir.1973). It is clear that a deputy's commission expires upon the termination of the appointing sheriff's term of office. *Kyles v. Calcasieu Parish Sheriff's Office*, 395 F.Supp. 1307 (W.D.La.1975); *Boyer v. St. Amant*, 364 So.2d 1338 (La.App. 4th Cir.1978); La. R.S. 33:1433. He serves at the pleasure of his sheriff or, as the case may be, does not serve due to the displeasure of his successor. The failure to send this first issue to a trier of fact does not upset the propriety of summary judgment.

The second issue raises the question whether the discharge of the deputies resulted solely because they did not support Fletcher in the sheriff's election. As an ancillary issue, the plaintiffs pose the question whether they hold non-confidential, non-policymaking positions. The plaintiffs surmise that if they held non-confidential, non-policymaking positions and were not reappointed because they did not support Fletcher, they should recover as a matter of law for unlawful infringement of their First and Fourteenth Amendment rights.

In this respect, granting all due deference to plaintiffs' allegations, summary judgment is appropriate where it is clear that even were they able to prove all the facts which they allege, they would not be entitled to judgment as a matter of law. *Kotmair v. Gray*, 505 F.2d 744 (4th Cir. 1974). We conclude that even were a trier of fact to find that the plaintiffs held non-confidential, non-policymaking positions as such words are commonly understood, and political considerations did either wholly or partially motivate Fletcher to refuse to recommission them, they could not recover as a matter of law in light of the special considerations attendant to a small parish Sheriff's Office.

The First Amendment of the U.S. Constitution, made applicable to the States through the Fourteenth Amendment, protects political association as well as political expression. *Buckley v. Valeo*, 424 U.S. 1, 15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). It protects the right of the people to voice support for a particular cause, political party, or candidate, however noxious such sentiments may appear to the majority. These fundamental rights, however, are not absolute. As set forth in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), we are guided by the following standards:

> "It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny. This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct Government action, but indirectly as an intended but inevitable result of Government conduct.' Thus, encroachment cannot be justified upon a mere showing of a legitimate state interest. The interest advanced must be paramount, one of vital importance, and the burden is on the Government to show the existence of such an interest. *Id. U.S.* at 363, 96 S.Ct. at 2684. (citations omitted)."

Thus, there must be a substantial overriding Government interest shown by the State to justify an encroachment on First Amendment rights. The means chosen to advance the interest must be closely tailored to achieving the desired end to avoid unnecessary abridgement. *Id.* Further, the means chosen to further the governmental interest must be the least restrictive alternative to achieving that end. See also *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

■ The Fifth Circuit has previously addressed the constitutional effect of a dismissal of a deputy sheriff by his sheriff's successor. *McBee, supra; Barrett v. Thomas*, 649 F.2d 1193 (5th Cir.1981). In *McBee*, the court found the dismissal constitutionally permissible. However, in *Barrett*, the discharge of a predecessor's deputy required an opposite result. The distinction between the cases rests on the size of the Sheriff's Office and the application of the *Elrod-Branti* exception in the small as opposed to the large county situation.

In *Barrett*, a Republican sheriff had defeated a Democratic incumbent. After taking office, he demoted a deputy who had supported the incumbent, and later fired him for making public statements in violation of departmental regulations. The case involved the Dallas County, Texas Sheriff's Office, employing 700 employees, including 550 deputies. The plaintiff deputy argued that he was a non-confidential, non-policymaking employee within the meaning of the *Elrod-Branti* exception. The court held that the demotion and subsequent discharge were unconstitutional. In doing so, the court intimated that the non-policymaking, non-confidential employee labels were, in effect, "irrelevant" after *Branti. Id.* at 1200. The court observed:

> "The Supreme Court recently refined the process of identifying those employees to whom the policy making classification should be applied. [*Branti, supra*]. In dismissing the labels 'confidential' and 'policy making' as irrelevant, the court declared, 'the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved. [*Id. U.S.* at 518, 100 S.Ct. at 1294].... [A]ny specific application of the exception must turn on the importance of political loyalty to the execution of the employee's duties." *Id.* at 1201.

The court concluded that in a large sheriff's office, "the absence of political cohesion between the sheriff and deputy can hardly be said to undermine an intimate working relationship." *Id.* Accordingly,

*Elrod* applied. The demotion and dismissal of the deputy was constitutionally prohibited when founded solely on political affiliation.

In a more recent case, *McBee, supra,* the court faced a situation analogous to the one at bar. In that case, the court applied the *Elrod-Branti* analysis to a situation where a non-civil service employee was not reappointed because he supported a particular candidate rather than affiliated with an outcast political party, *McBee, supra,* at 838, fn. 1. The critical facts are instructive.

The defendant Ybanez was the newly elected sheriff in Jim Hogg County, Texas. He defeated the incumbent Ramirez in the Primary Election running ran on a platform of "change." Upon taking office, Ybanez refused to reappoint three field deputies and two dispatchers who in some way supported Ramirez in the election. These persons brought suit under *Elrod-Branti* contending their First and Fourteenth Amendment rights to political belief and association were infringed because their non-reappointments were due solely to their support for Ramirez.

The court distinguished *Barrett, supra,* and held that the *Elrod-Branti* exception applied. In doing so, the court considered the "legal relationship of the sheriff and his deputies as well as the distinguishing factors presented in a small county situation." *McBee, supra,* at 839. The deputy in a small county has a more significant role in the community as a member of law enforcement. *Id.* The size of the office, therefore, heightens the importance of the fundamental right of voters to restructure their government. *Id.* This interest in "change" would be substantially infringed if a newly elected sheriff could not freely replace "those few deputies viewed by the voting public as the 'alter-ego' of the administration just voted out of office." *Id.* In carrying out the voters' mandate, a sheriff could require loyalty to himself which necessitates that he have confidence in his staff. *Id.* at 838–840. Otherwise, the abili-

ty of the Sheriff's Office to effectively perform its duties would be severely hampered. *Id.* at 840. Accordingly, the voters' interest in restructuring the government and the desire to promote efficiency in law enforcement outweighed any First Amendment concerns in a small county situation. *Id.*

In the context of a small sheriff's office, the Fifth Circuit summarily rejected the labels of "confidential" and "policymaking" used to determine that a political discharge was constitutionally permissible. Instead, the existence of a "high degree of personal accountability" between a sheriff and his deputies provided a suitable touchstone upon which to base a finding that dismissal for political reasons passed constitutional muster. *Id.* at 840. This high degree of personal accountability in a small sheriff's office "equates with the confidential nature of a deputy's employment", *Id.*, and defines the existence of a confidential and policymaking position. Thus, whenever a deputy is directly accountable to his sheriff without the intervention of intermediary supervisors which are normally found in a large organization, the exception of *Elrod* and not the rule applies. We find that such a situation exists here.

A high degree of personal accountability certainly exists between Fletcher and his deputies not unlike that found in *McBee*. Because of the size of the Natchitoches Parish Sheriff's Office, presently consisting of 40 deputies, more or less, we cannot conceive how a trier of fact could conclude otherwise. Although the depositions of the plaintiffs, Bridges, Fletcher, and James, indicate that the sheriff's office is somewhat compartmentalized with chiefs or supervisors within each division, this could not dissuade us, or any reasonable trier of fact, from the conclusion that any such arrangement stems from the necessity of insuring efficiency and does not operate to disassociate deputies or dispatchers from their sheriff. Each deputy, without a doubt, is directly answerable to the sheriff.

We do not deal with semantic distinctions but with the real relationship between a sheriff in a typically rural office and his deputies. We think that the *McBee* panel correctly recognized that the "non-confidential" and "non-policymaking" labels used in *Elrod-Branti* are simply irrelevant and inapplicable to the rural parish Sheriff's Office which, by its very nature, is *sui generis* for the purpose of evaluating whether a deputy's First and Fourteenth Amendment rights to political belief and association are infringed by a discharge for political reasons. It is quite clear that the Sheriff's race in Natchitoches Parish between Boyd Durr, the incumbent's candidate and Chief Deputy, and the other candidates, including Fletcher, involved a campaign for a change in the Sheriff's Office. The plaintiffs are not civil service or Federal government employees who cannot take an active part in political campaigns. None of them had any expectation of continued employment beyond the term of office of the incumbent Sheriff who appointed them. They actively campaigned for the incumbent's candidate Boyd Durr and made monetary contributions to his campaign. Boyd Durr himself is one of the plaintiffs in this suit. The election of Fletcher indicates a dissatisfaction with the incumbent, the need for a change. Certainly Fletcher's ability to accomplish this is impeded if he must reappoint 31 hostile employees secure in their jobs. This is not simply a matter of "to the victor go the spoils". Fletcher personally conducted interviews with and investigated these employees. He found 14 that he felt he could reappoint. We find that the public is entitled to the change in office personnel and policies which Fletcher was elected to accomplish; that this requires loyalty to Fletcher, which the reappointment of 17 employees rejected by him could not furnish; and that the public interest of the voting public should not be impaired by a blind adherence to *Elrod-Branti* principles. We hold that Fletcher is in reasonable compliance with those principles when he reappointed 14 of the 31 employees of his predecessor. The interest of the voting public demands that he enjoy the privilege of replacing the employees who might be disloyal to him. Under these

conditions any First or Fourteenth Amendment privileges of the 17 employees must yield. *Connick v. Myers,* 461 U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Gonzales v. Benavides,* 712 F.2d 142 (5th Cir. 1983); *McBee v. Jim Hogg County, supra.* Defendant's Motion for Summary Judgment is GRANTED.