**R. C. McCORMICK, Plaintiff-Appellee Cross Appellant,**

v.

**Edwin W. EDWARDS, etc., et al., Defendants-Appellants Cross Appellees.**

No. 79–3753.

United States Court of Appeals, Fifth Circuit. Unit A

May 28, 1981. Rehearing and Rehearing En Banc Denied June 22, 1981.

R. Gordon Kean, Jr., Baton Rouge, La., John DiGiulio, Camille F. Gravel, Jr., Alexandria, La., for Dumas.

Cooper & Thompson, William H. Cooper, Jr., Baton Rouge, La., for Delpit.

Thomas F. Wade, Asst. Atty. Gen., Baton Rouge, La., for Edwards and White.

Elliott W. Atkinson, Jr., Leo J. Berggreen, Baton Rouge, La., for McCormick.

Before AINSWORTH and SAM D. JOHNSON, Circuit Judges, and HUNTER *, District Judge.

AINSWORTH, Circuit Judge:

The appellants, Edwin Edwards, a former Governor of Louisiana and three other government officials,[1] appeal from the judgment of the district court, 479 F.Supp. 295, holding them liable for damages based on allegations that they conspired to bring about the termination of the appellee, R. C. McCormick, from his position as Program Director of the Capital District Law Enforcement Planning District in violation of 42 U.S.C. § 1983. The district court held that McCormick was unlawfully discharged because of his political activities and found the defendants personally liable in their individual capacities for damages, including attorney's fees, in the amount of $63,713. Appellants raise several issues on appeal. First, they contend that two of the appellants, Governor Edwards and Wingate White, are immune from personal liability. They also maintain that McCormick was a policy-making or confidential employee and thus not entitled to the same protection against patronage dismissal as other employees. Appellants also assert that, considering the nature of McCormick's job, the State's interest in limiting his political activities outweighs his own First Amendment interests. Finally, the appellants contend that the activities engaged in by McCormick are not of the kind entitled to protection under *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and later cases. The last two issues are closely related since *Elrod* determined what activities are entitled to protection by balancing the interests of the state with the First Amendment and other interests of the employee. We agree that McCormick's ac-

tivities are not protected by *Elrod* or otherwise since the State's interest in regulating this kind of political involvement outweighs the employee's interests. It is therefore not necessary to discuss the other issues.

THE FACTS

The federal statutory scheme which established the Law Enforcement Assistance Administration (LEAA) and provided for LEAA grants to assist states in their law enforcement efforts, required each recipient state to establish a law enforcement planning agency. 42 U.S.C. § 3723 (repealed 1979).[2] The statute also authorized the state to create regional planning groups "comprised of a majority of local elected officials." *Id.* In 1972, Governor Edwards complied with the federal statute by establishing the Louisiana Commission on Law Enforcement and Administration of Justice (the "Commission") and, under the Commission, nine regional planning groups including the Capital District Law Enforcement Planning District (the "Planning District"). The Governor appointed Wingate White Executive Director of the Commission and White, after consulting with the Governor's office, appointed R. C. McCormick District Program Director of the Planning District. In 1975, McCormick resigned his position to run for Sheriff of East Baton Rouge Parish. He was rehired shortly after being defeated in that election.

McCormick actively supported the candidacy of Jack Breaux in the 1976 Baton Rouge mayoralty election. He held a party at his home in support of Breaux's campaign, distributed cards for the candidate and spoke on Breaux's behalf at a public meeting held at a local school. Breaux's opponent, Mayor Woodrow W. Dumas, was disturbed by McCormick's role in the campaign and complained to Governor Ed-

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. The other appellants are Wingate White, Executive Director of the Louisiana Commission on Law Enforcement and Administration of Justice, Woodrow W. Dumas, Mayor of Baton Rouge, and Joseph Delpit, Louisiana State Representative.

2. In 1979, as part of a major revision of the statutes dealing with LEAA, Section 3723 was repealed and replaced by an unrelated provision. Much of the content of previous Section 3723 is now incorporated in other sections. *See, e. g.,* 42 U.S.C. § 3742. McCormick was terminated in 1976, so we refer to the repealed law.

wards. Joseph Delpit, a state representative from Baton Rouge, also complained to the Governor about McCormick's political activities.

On March 24, 1976, at the direction of the Governor's office, White wrote a letter to McCormick expressing his dissatisfaction with reports that McCormick "indulged in criticism of officials connected with the Baton Rouge city government . . . ." White pointed out that "a good harmonious relationship is necessary to the success of our mission," and stated that he hoped "no subsequent action will be necessary." The complaints to the Governor about McCormick continued, however. On May 11, 1976, again at the direction of the Governor, White handed a letter to McCormick informing him that he was being terminated as a result of his political involvement. On May 18, McCormick and several members of the Planning District met with Governor Edwards to discuss the termination. The Governor expressed a willingness to reinstate McCormick if he would discontinue his political activities, but McCormick refused to do so and the meeting ended quickly.

On September 3, 1976, McCormick filed this suit against Governor Edwards and Wingate White alleging that they terminated McCormick for political reasons in violation of 42 U.S.C. § 1983 and other statutes. On November 3, 1977, an amended complaint was filed adding Mayor Dumas and Representative Delpit as additional defendants, alleging that they conspired with Edwards and White to secure the discharge "solely as a political reprisal for complainant's support of the opposition candidate for mayor in the 1976 election in Baton Rouge." The case was tried in district court without a jury and, on July 19, 1979, the court held that McCormick's discharge was indeed due to his activities in the mayoralty campaign and was the unlawful product of a conspiracy among the four defendants. The court later held that all four defendants were personally liable for damages, including attorney's fees, in the amount of $63,173.

Although there were many issues contested in the district court and several issues presented here on appeal, we find one issue to be controlling: whether a non-civil service state employee, engaged neither in policy-making nor confidential duties, is constitutionally protected from being discharged for becoming actively involved in a partisan election campaign. The district court ruling, the amended complaint and the plaintiff's testimony all demonstrate that McCormick's basic contention is that he was discharged for his involvement in the 1976 Baton Rouge mayoralty campaign. The district court's finding that that involvement was the reason for the discharge is not clearly erroneous. McCormick testified that he gave a party for candidate Breaux and worked for the candidate after working hours. McCormick even acted as a stand-in speaker for Breaux at a public meeting. It is not contested that, as a non-civil service employee, McCormick serves at the will of his superiors and can be discharged for any legitimate reason or even for no reason at all. However, he cannot be fired for exercising constitutionally protected rights unless some governmental interest outweighs the employee's interest in exercising those rights. *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Hastings v. Bonner*, 578 F.2d 136 (5th Cir. 1978); *Stapp v. Avoyelles Parish School Board*, 545 F.2d 527 (5th Cir. 1977). It cannot be denied that McCormick, like all citizens, has a constitutionally protected right to actively support, work for and campaign for a partisan candidate for political office or even to run for such office himself. *Elrod v. Burns*, 427 U.S. 347, 370–71, 96 S.Ct. 2673, 2688, 49 L.Ed.2d 547 (1976); *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *McBride v. Askew*, 541 F.2d 465 (5th Cir. 1976). Thus, on this appeal we must decide whether the State's interest in prohibiting its employees from engaging in such activities outweighs the employee's rights.

## THE HISTORY OF REGULATION OF POLITICAL ACTIVITY

There is a long history of conflict in this country between government employers,

themselves most often products of the political system, and employees desiring to fully exercise the political rights of citizens. In 1801, President Thomas Jefferson expressed his concern with the political activities of federal employees:

> The President of the United States has seen with dissatisfaction officers of the General Government taking on various occasions active parts in elections of the public functionaries, whether of the General or of the State governments. Freedom of elections being essential to the mutual independence of governments and of the different branches of the same government, so vitally cherished by most of our constitutio..s, it is deemed improper for officers depending on the Executive of the Union to attempt to control or influence the free exercise of the elective right.... The right of any officer to give his vote at elections as a qualified citizen is not meant to be restrained, nor, however given, shall it have any effect to his prejudice; but it is expected that he will not attempt to influence the votes of others nor take any part in the business

of electioneering, that being deemed inconsistent with the spirit of the Constitution and his duties to it.

10 J. Richardson, Messages and Papers of the Presidents 98–99 (1897). Several subsequent presidents issued orders banning partisan political activity by federal employees.[3] The first federal civil service law, the Pendleton Act of 1883, included prohibitions of coercion of civil servants for political reasons and making, soliciting or assessing political contributions from or by federal employees.[4] In 1907, President Theodore Roosevelt issued an executive order to the effect that federal civil servants, "while retaining the right to vote as they please and to express privately their opinions on political subjects, shall take no part in political management or political campaigns." Exec. Order No. 642 (June 3, 1907).

Finally, in 1939, Congress enacted the Hatch Act, a comprehensive scheme regulating political activity of federal employees.[5] One of the Hatch Act's provisions bars federal employees from "tak[ing] an active part in political management or in political campaigns." 5 U.S.C. § 7324.[6]

**3.** See H. Kaplan, *The Law of Civil Service 17–18* (1958); Friedman & Klinger, *The Hatch Act: Regulation of Administrative Action of Political Activities by Governmental Employees*, 7 Fed. B.J. 5, 6–8 (1945); Vaughn, *Restrictions on the Political Activities of Public Employees: The Hatch Act and Beyond*, 44 Geo.Wash.L.Rev. 516, 516–18 (1976).

**4.** 22 Stat. 403, 404, 406–07 (1883).

**5.** 53 Stat. 1147, 1148 (1939). The Hatch Act, as amended, is somewhat scattered in the United States Code.

**6.** 5 U.S.C. § 7324 reads as follows:
(a) An employee in an Executive agency or an individual employed by the government of the District of Columbia may not—
(1) use his official authority or influence for the purpose of interfering with or affecting the result of an election; or
(2) take an active part in political management or in political campaigns.
For the purpose of this subsection, the phrase "an active part in political management or in political campaigns" means those acts of political management or political campaigning which were prohibited on the part of employees in the competitive service before July 19, 1940, by determinations of the Civil Service

Commission under the rules prescribed by the President.
(b) An employee or individual to whom subsection (a) of this section applies retains the right to vote as he chooses and to express his opinion on political subjects and candidates.
(c) Subsection (a) of this section does not apply to an individual employed by an educational or research institution, establishment, agency, or system which is supported in whole or in part by the District of Columbia or by a recognized religious, philanthropic, or cultural organization.
(d) Subsection (a)(2) of this section does not apply to—
(1) an employee paid from the appropriation for the office of the President;
(2) the head or the assistant head of an Executive department or military department;
(3) an employee appointed by the President, by and with the advice and consent of the Senate, who determines policies to be pursued by the United States in its relations with foreign powers or in the nationwide administration of Federal laws;
(4) the Mayor of the District of Columbia, the members of the Council of the District of Columbia, or the Chairman of the Council of the District of Columbia, as established by

The state legislatures were equally active in prohibiting the political activity of civil servants, with some states enacting laws considerably earlier than the passage of the Hatch Act.[7] Virtually all states now place at least some restrictions on the political activities of employees.[8] The Louisiana Constitution prohibits employees in the classified service from taking an "active part in the management of the affairs of a political party, faction, candidate, or any political campaign, except to exercise his right as a citizen to express his opinion privately, to serve as a commissioner or official watcher at the polls, and to cast his vote as he desires."[9] State and federal regulations have been uniformly upheld against constitutional challenges in both state and federal courts.[10]

## McCORMICK'S CLAIM UNDER *ELROD* AND *BRANTI*.

■ Notwithstanding this long history of regulation of the political activities of public officers and employees, McCormick argues that his discharge was unconstitutional. In support of this contention, he relies on two recent Supreme Court cases: *Elrod v. Burns, supra,* and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). In *Elrod,* the petitioners challenged the discharge by the newly-elected Sheriff of Cook County, Illinois, of all non-civil service employees not of the Sheriff's political party. The Court found the practice unconstitutional, holding that a "nonpolicymaking, nonconfidential government employee can[not] be discharged or threatened with discharge from a job he is satisfactorily performing upon the sole ground of his political beliefs." 427 U.S. at 375, 96 S.Ct.

the District of Columbia Self-Government and Governmental Reorganization Act; or
    (5) the Recorder of Deeds of the District of Columbia.

7. *See, e. g.,* statutes discussed in *Commonwealth v. McCarthy,* 281 Mass. 253, 183 N.E. 495 (1932); *Stowe v. Ryan,* 135 Or. 371, 296 P. 857 (1931); *Sarlls v. State,* 201 Ind. 88, 166 N.E. 270 (1929); *Duffy v. Cooke,* 239 Pa. 427, 86 A. 1076 (1913).

8. A list of state statutes is found in *Broadrick v. Oklahoma,* 413 U.S. 601, 604 n.2, 93 S.Ct. 2908, 2912 n.2, 37 L.Ed.2d 830 (1975).

9. La.Const. Art. 10, § 9. The provision in its entirety reads as follows:
    **§ 9. Prohibitions Against Political Activities**
    Section 9. **(A) Party Membership; Elections.** No member of a civil service commission and no officer or employee in the classified service shall participate or engage in political activity; be a candidate for nomination or election to public office except to seek election as the classified state employee serving on the State Civil Service Commission; or be a member of any national, state, or local committee of a political party or faction; make or solicit contributions for any political party, faction, or candidate; or take active part in the management of the affairs of a political party, faction, candidate, or any political campaign, except to exercise his right as a citizen to express his opinion privately, to serve as a commissioner or official watcher at the polls, and to cast his vote as he desires.

**(B) Contributions.** No person shall solicit contributions for political purposes from any classified employee or official or use or attempt to use his position in the state or city service to punish or coerce the political action of a classified employee.
    **(C) Political Activity Defined.** As used in this Part, "political activity" means an effort to support or oppose the election of a candidate for political office or to support a particular political party in an election. The support of issues involving bonded indebtedness, tax referenda, or constitutional amendments shall not be prohibited.

10. *See, e. g., United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1975); *Broadrick v. Oklahoma, supra; United Public Workers of America v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *Ricks v. Department of State Civil Service,* 200 La. 341, 8 So.2d 49, 58–59 (1942). In one of the earliest cases upholding a discharge of a public employee who displeased his superior by engaging in political activities, Justice Holmes, then of the Supreme Judicial Court of Massachusetts, held that a mayor could lawfully discharge a politically active policeman. In a now familiar line, Justice Holmes put the matter succinctly: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. City of New Bedford,* 155 Mass. 216, 29 N.E. 517, 517 (1892).

at 2690 (Stewart, J., concurring).[11] In *Branti*, a closely-divided Court held that assistant public defenders in Rockland County, New York, were neither policy-making nor confidential employees and thus could not be replaced merely because they differed in political allegiance from the Public Defender.

McCormick's reliance on *Elrod* and *Branti* is misplaced. These cases are clearly limited to situations in which employees are discharged solely because of their political affiliation or beliefs. McCormick does not contend that he was terminated because he is a Republican, a Democrat, or a member of any particular party, or because he held certain political beliefs. He was discharged because of his active participation in the 1976 Baton Rouge mayoralty campaign. Neither *Elrod* nor *Branti* deals with a situation similar to the one now before this court.

Moreover, neither *Elrod* nor *Branti* overruled *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), or its companion case, *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In fact, *Elrod* explicitly followed *Letter Carriers* and its predecessor, *United Public Workers of America v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). *Elrod v. Burns, supra*, 427 U.S. at 366–71, 96 S.Ct. at 2686–89. *Letter Carriers, Mitchell*, and *Broadrick*, rather than *Elrod* or *Branti*, control the present case. *Letter Carriers* upheld the validity of the provisions of the Hatch Act prohibiting federal employees from taking an active part in political campaigns.[12] The Court listed a wide range of political activities which Congress could regulate:

> We unhesitatingly reaffirm the *Mitchell* holding that Congress had, and has, the power to prevent [federal employees] from holding a party office, working at the polls, and acting as party paymaster for other party workers. An Act of Congress going no farther would in our view unquestionably be valid. So would it be if, in plain and understandable language, the statute forbade activities such as organizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; becoming a candidate for, or campaigning for, an elective public office, actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention. Our judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees.

413 U.S. at 556, 93 S.Ct. at 2886. *Broadrick* reached the same conclusion for state prohibitions of active political involvement by state and local government workers.[13] McCormick's activities clearly came within the scope of the "kind of partisan political

---

11. There was no opinion for the Court in *Elrod*. The plurality opinion, written by Justice Brennan, with Justices White and Marshall concurring, reached its conclusion on broader grounds than the opinion of Justice Stewart, with whom Justice Blackmun joined. Justice Stevens took no part in the case; the remaining three justices dissented. In a case like this one, where no opinion commands a majority, "the holding of the Court may be viewed as that position taken by those members who concurred in the judgment on the narrowest grounds ...." *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 2923 n.15, 49 L.Ed.2d 859 (1976). Thus the opinion of Justice Stewart states the holding of the Court.

12. The portion of the Hatch Act challenged in *Letter Carriers* is set out in note 5, *supra*.

13. In *Letter Carriers*, the plaintiff union challenged the Hatch Act provisions on substantive grounds and also claimed that the law was unconstitutionally vague and overbroad. 413 U.S. at 551–54, 93 S.Ct. at 2883–85. The *Broadrick* appellants conceded the substantive validity of the state statute but claimed that it too was vague and overbroad. 413 U.S. at 606–07, 93 S.Ct. at 2913. The substantive validity of the Hatch Act provisions was previously upheld in *United Public Workers of America v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

conduct" found subject to regulation in *Letter Carriers*. By holding a party for candidate Breaux at his home, McCormick "actively participat[ed] in fund-raising activities for a partisan candidate," and by handing out cards and speaking on Breaux's behalf at a public meeting, McCormick "solicit[ed] votes for a partisan candidate for public office."

Thus, state and federal governments can constitutionally discharge civil service employees for precisely the same activities engaged in by McCormick. It would be an anomaly for us to hold that Governor Edwards and Wingate White could not discharge McCormick, a non-civil servant serving at their will, for engaging in activities for which a civil servant could be discharged. McCormick's constitutional rights are no broader than those of other government workers. He can be discharged for any reason, even for no reason at all, as long as he is not fired for a constitutionally impermissible reason. Thus, his discharge was not unlawful and the district court erred in ruling to the contrary. We accordingly reverse the district court's judgment in favor of the plaintiff McCormick and render judgment in favor of the defendants.

REVERSED AND RENDERED.

SAM D. JOHNSON, Circuit Judge, dissenting:

Plaintiff McCormick was discharged from his position as Program Director of the Capital District Law Enforcement Planning Council. The Governor of Louisiana, defendant Edwards, dismissed McCormick because of the latter's active support of a mayoral candidate in the 1976 Baton Rouge election. The question in this case is whether McCormick's local political activity, which is within the protection of the first amendment, was overridden by a sufficiently important state interest.

For the answer to this question, this Court was presented with two lines of cases. On the one hand, there are *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*,

445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). These hold that government employees cannot be dismissed on the sole ground of political belief or party affiliation unless it is an appropriate requirement for the effective performance of the public office involved. On the other hand, there are *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), and *United Public Workers of America v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). These cases uphold statutory prohibitions of partisan political activities by government employees. The majority concludes that McCormick's partisan political conduct falls within the *Letter Carriers* line of cases, and therefore hold that the discharge for political activism was permissible.

This case, however, does not involve the application of a *statutory* or other regulatory prohibition of political activities. Although an employee of the state government, McCormick was not within Louisiana's prohibition of partisan political activities by state employees. *See* La.Const. art. 10, §§ 2, 9 (1974). *Broadrick*, the companion case to *Letter Carriers*, upheld similar state prohibitions of active political involvement by state and local government workers. But because there is no generic state prohibition applicable to McCormick in the case at bar, *Broadrick* is inapposite. Nonetheless, the majority relies on the *Letter Carriers* line of cases to hold that McCormick's discharge was not for a constitutionally impermissible reason. In so doing, the majority assumes the existence of a fact the district court found not to be true. To see how this is so first requires a brief summary of the defendants' argument below.

Defendants' theory of defense was that adequate performance of McCormick's job as liaison between the Louisiana Commission on Law Enforcement and Administration of Criminal Justice and various local law enforcement agencies required that McCormick remain politically neutral. De-

fendants claimed that McCormick's political activities prevented him from maintaining cordial and harmonious relationships with the local officials. In other words, defendants assert that McCormick was in effect dismissed for cause, and not solely for the exercise of first amendment rights, because the exercise of those rights made McCormick's job performance allegedly unsatisfactory.

Such a defense properly states the law. The first amendment protects political association—including partisan political activities by government employees—as well as political expression. *Buckley v. Valeo*, 424 U.S. 1, 15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976); *Mitchell*, 330 U.S. at 94–95, 67 S.Ct. at 566–567. Since involvement in partisan politics lies close to the core of the first amendment, the exercise of these rights can only be overridden on a showing of a sufficiently important governmental interest. *Letter Carriers*, 413 U.S. at 564, 93 S.Ct. at 2889. In the *Letter Carriers* and *Broadrick* cases, the statutory prohibition against the exercise of these rights was justified on a proper showing of the interest in the efficient, fair, effective, and impartial administration of the executive branch of the government. One of the factors in the Court's balancing of the government's interest in efficient public service and the employee's interest as a citizen was that the political activity restrictions there were not aimed at particular parties, groups, or points of view, but applied even-handedly to all covered partisan conduct, and did not seek to control political opinions or beliefs or interfere with the right to vote. *Letter Carriers*, 413 U.S. at 564, 93 S.Ct. at 2889.

Since there was no generic prohibition of McCormick's political activities, the analysis must proceed case-by-case in determining whether the dismissal was justified because these activities are demonstrably incompatible with the discharge of the employee's public duties. Although the defendants alleged such an incompatibility, the district court found as a fact that McCormick was discharged solely for his political activities, and not because of any poor job performance. This finding of fact was based on the testimony of many witnesses, including local officials who did not find McCormick's political activism to have affected his working relationship with them. This and other testimony overwhelmingly demonstrated that McCormick was doing not just a satisfactory job, but an exemplary job. Defendant White in fact testified that McCormick had been doing satisfactory work and was fired for solely political reasons. The only testimony to the contrary was that of some of the other defendants.

Findings of fact, of course, cannot be set aside unless clearly erroneous. Fed.R.Civ. Pro. 52(a). Due regard is to be given to the trial court's opportunity to judge the credibility of witnesses. *Id.* Indeed, the appellate court must be especially reluctant to set aside a finding based on the trial judge's evaluation of conflicting oral testimony. 9 C. Wright & A. Miller, Federal Practice & Procedure § 2586, at 737 (1971); *Matter of Multiponics, Inc.*, 622 F.2d 709, 723 (5th Cir. 1980). The majority recognizes the district court finding that McCormick's discharge was motivated solely by political pressures, and holds that this finding is not clearly erroneous. The majority fails to recognize, however, the district court's finding that McCormick's political activities did not impair his ability to effectively and fairly discharge his public office. Before the majority can reach the legal issue of whether the governmental interest in effective public service outweighs McCormick's right to engage in partisan political activities, it must first deal with the factual issue of whether such a governmental interest existed in this particular case. After reviewing the record, this writer is not left with a "definite and firm conviction" that the district court erred in its conclusion. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). I accordingly dissent.