**Leroy J. MATHERNE, Plaintiff–Appellee Cross–Appellant,**

v.

**Charles C. WILSON, et al., Defendants–Appellants Cross–Appellees.**

No. 87–3161.

United States Court of Appeals, Fifth Circuit.

Aug. 10, 1988.

Richard M. Michalczyk, Cronvich, Wambsgans & Michalczyk, Metairie, La., for Wilson.

Steven F. Griffith, Sr., Ltd., Destrehan, La., for Wilson & Marino.

Peter D. Derbes, Frank A. Silvestri, Silvestri & Massicot, New Orleans, La., for Matherne.

Before GARZA, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Former Sheriff Charles C. Wilson and his successor, Sheriff Johnny Marino, appeal from a judgment for Leroy J. Matherne, a deputy, on the trial of Matherne's § 1983 claim that Wilson fired him for campaigning for Wilson's political opponent. Persuaded that he is entitled to qualified immunity, we reverse the judgment against Wilson in his individual capacity. We otherwise affirm, persuaded that, measured by current first amendment jurisprudence, the firing contravened the first amendment.

I

Charles C. Wilson, sheriff of St. Charles Parish, Louisiana, hired plaintiff Leroy J. Matherne to serve as a full-time deputy sheriff. Matherne worked as one of twelve investigators of the Criminal Investigative Division of the sheriff's department. Through a strict chain of command, the sheriff supervised a Chief Deputy who supervised five Deputy Chiefs, each in charge of separate divisions: criminal investigative, patrol, administrative, crime scenes and jail, and civil. The Chief Deputy for the Criminal Investigative Division, Chief Deputy Rooks, supervised three sergeants, who in turn supervised the twelve investigators, one of whom was Matherne. Wil-

son testified that the other divisions had similar chains of command, though some were less rigid.

Wilson's announced policy was to permit deputy sheriffs "to engage in reasonable political activities on behalf of any candidate of their choice for a political office" but forbidding them from campaigning while on duty and from holding an office in a campaign organization. Wilson later changed this policy to prohibit all sheriff's office personnel from campaigning for a candidate other than Wilson in an upcoming election for St. Charles Parish Sheriff.[1]

A month after the change in policy, Matherne served as a cook at a meeting of potential supporters of Buster Puglise, Wilson's opponent in the upcoming election for sheriff. Matherne was off-duty and out of uniform at the time, although there was some evidence that he had parked his sheriff's department car where it was visible to passersby. There was no evidence that Matherne participated in the meeting beyond serving as cook, as he had done before at political and charitable events. A few days later, Matherne, his wife, and their son attended the local Catfish Festival. Matherne again was off-duty and out of uniform, and though he wore no campaign paraphernalia, Matherne's wife and son wore assorted "Puglise for Sheriff" hats, shirts, and buttons.

When Wilson learned of these events, he met privately with Matherne where he reprimanded him for violating the departmental policy. Matherne told Wilson that he would abide by the rule against campaigning for others but planned to vote for Puglise.

A week later Matherne, again while off duty and out of uniform, dropped by Puglise's office at Puglise's request. There

1. Wilson's "Departmental Policy on Political Activities" provided:

Although all deputies are free to refrain from becoming involved in political activities, no employee of the St. Charles Parish Sheriff's Department who is actively involved in the support of another candidate in the sheriff's race other than the sheriff may retain his or her commission. The purpose of this policy

is to keep deputies from creating controversy and disruption within the Department and criticizing the Department's policies and operations to the public while they are duty-bound to support those policies and operations. You are expected to make your choice and do so with the highest degree of honesty and integrity.

was no dispute but that Puglise and Matherne had been friends for a long time and that Puglise's office was a popular gathering place for citizens and deputies, even before his campaign for sheriff, in part, perhaps, because he provided free coffee and donuts. It was also undisputed that Wilson himself often stopped by Puglise's office. Matherne recalled that while he was at Puglise's office on this particular occasion, a Puglise campaign worker stopped by to bring some materials to Puglise, that the conversation of the five or six people gathered there turned to Puglise's campaign, but that Matherne himself did not participate in the discussion. Wilson testified that he was told by a supporter of Puglise that this "discussion" was in reality a full-blown meeting of active campaign employees, and he fired Matherne for active participation in the campaign of his opponent. The termination was effective July 25, 1983.

Matherne sued Wilson individually, and Wilson and Johnny Marino, who had replaced Wilson as sheriff,[2] in their official capacities. Matherne alleged that Sheriff Wilson denied Matherne his rights under the first amendment by firing him for supporting the sheriff's opponent.

At trial, the jury found for Matherne and awarded $20,000 as damages, consisting of $6,000 in "nominal" damages, $9,000 for financial loss, and $5,000 for mental anguish. At the same time, the jury found that Wilson had not acted with malice and awarded no punitive damages.

After the jury returned its verdict, the court entered findings of fact and conclusions of law on the issue of whether Wilson was justified in firing Matherne to protect the effectiveness of the sheriff's office, an issue that the court determined to be a question of law. The court concluded:

[Wilson's] political activity policy as applied to [Matherne] bore no relationship to any legitimate interest of [Wilson] as an employer[,] and [Matherne's] activities had no adverse affect [sic] on [Wilson's] interest in the fair and efficient enforcement of the law. Therefore, [Wilson] unconstitutionally discharged [Matherne] from employment in retaliation for [Matherne's] exercise of rights protected by the first and fourteenth amendments....

The district court, however, reduced the total award to $14,100 by reducing the award of nominal damages from $6,000 to $100. The judgment as entered was against Wilson individually as well as against Wilson and Marino in their official capacities.

On appeal, defendants argue that the district court erred: (i) in denying Wilson qualified immunity; (ii) in casting Wilson in his individual capacity rather than solely in his official capacity; (iii) in failing to direct a verdict; (iv) in refusing to give requested jury charges; (v) in shifting the burden of proof to defendants in its verdict form; (vi) in refusing to admit evidence of paid unemployment compensation offered to offset Matherne's claimed lost wages; and (vii) in requiring closing arguments before the charge conference. On cross-appeal, Matherne argues that the court erred in reducing the verdict without giving him the option of partial retrial on the damages issue.

II

Wilson argues that as a public official, he was entitled to qualified immunity in his individual capacity; that the court erred in rejecting his preferred jury charge and in denying his motions for summary judgment and directed verdict on this ground. Under the *Harlow v. Fitzgerald*[3] standard of "qualified" immunity, a public official

**2.** The original complaint listed Wilson, the sheriff's office, and the state of Louisiana as defendants. Louisiana's motion to dismiss for lack of jurisdiction was granted. Subsequently, the suit itself was dismissed for lack of prosecution. Matherne's motion for reconsideration requesting reinstatement of the action against Sheriff Wilson was granted. Then, Marino was added as a substitute defendant pursuant to Federal Rule of Civil Procedure 25(d). Marino and Wilson later named Louisiana as a third-party defendant, but the district court also granted Louisiana's second motion to dismiss.

**3.** 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

cannot be saddled with damages for actions that do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."[4] Wilson argues that in firing Matherne he violated no "clearly established law" and thus was entitled to *Harlow* immunity.

## A

■ First, however, we must address the question of whether Sheriff Wilson has preserved his argument for appeal. Matherne suggests that Wilson has waived his qualified immunity defense because Wilson failed to appeal the denial of his motions. Although Wilson was entitled to take an interlocutory appeal,[5] we are not persuaded that he was obligated to do so.

"Qualified immunity" includes "an entitlement not to stand trial or face the other burdens of litigation."[6] In *Mitchell v. Forsyth,* the Supreme Court explained that "[t]he [qualified immunity] entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."[7] Yet, and as Matherne's argument perversely ignores, *Mitchell* also reaffirms that qualified immunity serves to protect public officials from an award of money damages,[8] and this concern remains after a trial.

We are not persuaded that the exception *Mitchell* carved from the finality of judgment rule was intended to override the general doctrine of appealability. There may be good reasons why a defendant may elect to not appeal before trial, and we see little value in a rule of waiver that would force unwanted appeals, many of which undoubtedly never would have been necessary. In short, the right to appeal before trial belongs to a defendant, protecting him from money damages as well as from the costs of defending a suit. We see no reason to force pretrial appeals.[9]

## B

■ A public official is protected by qualified immunity if a reasonable officer would have believed that his actions met constitutional standards.[10] Significantly, the question is not whether the law was settled, viewed abstractly, but whether, measured by an objective standard, a reasonable officer would know that his action is illegal:

[O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear *that a reasonable official would understand that what he is doing violates that right.* This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of preexisting law the unlawfulness must be apparent.*[11]

The narrower focus dictated by *Anderson* requires that the law's certainty be measured against an objectively reasonable view of the facts facing an official. Detaching legal principles from the context of an official's acts leaves the official at the mercy of generalization and fails to

---

4. *Id.* at 818, 102 S.Ct. at 2738.

5. *See Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985).

6. *Id.,* 105 S.Ct. at 2816.

7. *Id.* (emphasis in original).

8. *See id.* at 2815 (citing *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737).

9. We are not alone in so concluding. *See McIntosh v. Weinberger,* 810 F.2d 1411, 1431 n. 7 (8th Cir.1987) ("failure immediately to appeal the rejection of a qualified-immunity defense does not bar raising it on appeal after trial"), *cert. denied,* 108 S.Ct. 2870 (1988); see also *9 Moore's Federal Practice ¶ 110.18 (1986) (explaining that, on principle, the interlocutory appeal is permissive, not mandatory, and a party does not forfeit a right to appeal after judgment for failure to appeal interlocutorily).*

10. *See Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987).

11. *Id.,* 107 S.Ct. at 3039 (emphasis added) (citations omitted).

serve qualified immunity's accommodation of constitutional duty and administrative freedom. "Any general statement is like a checque drawn on a bank. Its value depends on what is there to meet it." [12] And without factual context, the bank account is empty.

In applying *Anderson*, then, we look to the existing law and the events as they transpired in July, 1983, when Wilson fired Matherne. We need not pause to determine from the array of those possibly drawn from the events, the set of facts that objectively would have been reasonable in the eyes of a St. Charles Parish sheriff. Wilson's entitlement to qualified immunity is plain even accepting the facts in the light most favorable to Matherne. Taking then the facts in this light, whether found by the court or the jury: (1) Matherne was a non-policy making employee; (2) Matherne actively engaged in political activity; (3) that activity did not disrupt the on-going business of the St. Charles Parish Sheriff's office; and (4) Wilson fired Matherne for no other reason than his political activity. The inquiry is whether in July, 1983, the law was sufficiently clear that Wilson, as a reasonable officer, would have known that he could not fire a non-policy making employee solely on the ground that the employee was engaged in the political campaign of an opponent. We are not persuaded that it was.

Pointedly, at the time Wilson fired Matherne, a reasonable officer would have had the benefit of *McCormick v. Edwards*.[13] There, a state non-civil service employee sued the Governor of Louisiana and others alleging that he had been fired unconstitutionally as a result of his active support of the opposition's mayoral candidate. We held that the firing was constitutional:

It is not contested that, as a non-civil service employee, McCormick serves at the will of his superiors and can be discharged for any legitimate reason or even for no reason at all. However, he cannot be fired for exercising constitutionally protected rights unless some governmental interest outweighs the employee's interest in exercising those rights.[14]

We then concluded that the state's interest in prohibiting such activities outweighed the employee's right to support and campaign for a partisan candidate for political office.[15]

In so holding, we distinguished the then-recent Supreme Court cases of *Elrod v. Burns*[16] and *Branti v. Finkel*,[17] in which the Court held that a "nonpolicymaking, nonconfidential government employee can[not] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." [18] We dismissed McCormick's reliance on *Elrod* and *Branti*, noting:

These cases are clearly limited to situations in which employees are discharged solely because of their political affiliation or beliefs. McCormick does not contend that he was terminated because he is a Republican, a Democrat, or a member of any particular party, or because he held certain political beliefs. He was discharged because of his active participation in the 1976 Baton Rouge mayoralty campaign. Neither *Elrod* nor *Branti* deals with a situation similar to the one now before this court.[19]

We then noted that the Supreme Court had reaffirmed the validity of the provisions of the Hatch Act prohibiting federal employees from actively participating in partisan

---

**12.** Ezra Pound, *The ABC's of Reading* (1934).

**13.** 646 F.2d 173 (5th Cir. Unit A), *cert. denied*, 454 U.S. 1017, 102 S.Ct. 552, 70 L.Ed.2d 415 (1981).

**14.** *Id.* at 175.

**15.** *See id.* at 175, 179.

**16.** 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

**17.** 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

**18.** *Elrod*, 427 U.S. at 375, 96 S.Ct. at 2690 (Stewart, J., concurring in the judgment).

**19.** *McCormick*, 646 F.2d at 178.

politics,[20] and the validity of state statutes proscribing political activity by state and local government workers.[21] We concluded that, as a non-civil service employee, "McCormick's constitutional rights are no broader than those of other government workers."[22]

Without looking further, we are convinced that with *McCormick* as the controlling law of this circuit at that time, it would not have been apparent to a reasonable official in Wilson's shoes that firing Matherne for his political activity would deny his constitutional rights. It is true that Sheriff Wilson's policy proscribed only political campaigning for his opponents. However, *McCormick* explicitly holds that a state official can fire an employee for engaging in political activity, and we cannot say that the law was "clearly established" that the right to fire found in *McCormick* was lost because Wilson would not have fired Matherne for campaigning for the sheriff himself.

Of course, a strong argument can be made that Sheriff Wilson's policy in effect penalized political belief not activity and thus was unconstitutional under *Elrod* and *Branti*. But it does not follow from the force of such an argument that the principle toward which it drives was "clearly established." As we will explain, our own court was not then so certain.

■ Arguably, our conclusion that in July, 1983 the law was not "clearly established" flies in the face of our September, 1983 decision in *Bueno v. City of Donna.*[23] There, former non-supervisory public works department employees sued certain officials of the City of Donna, Texas, their employer, alleging that they were fired or forced to resign because they attended political meetings in support of defendants' opponents in a city election. We affirmed the district court's determination "that at the time of the firings [1978], the law was 'settled' that non-policy making employees cannot be discharged from their public employment because of their political activities."[24]

*Bueno*, however, differs from this case in important respects. First, although the facts were similar to *McCormick*, the *Bueno* court cited only *Elrod* for the proposition that an employee could not be fired for his political activity; the court apparently overlooked the fact that in *McCormick*, a decision it was obligated to follow, we had held that *Elrod* was not applicable where political activity rather than political belief alone was at issue. Second, *Bueno* obviously was a pre-*Anderson* decision, and in light of the clarified test by the intervening decision of the Supreme Court, a holding that the law was "settled" in 1978 does not bind us to a determination that the law was "clearly established" in 1983. The *Bueno* panel found certainty in the law by stating the principles at a level of generality that *Anderson* forbids, and we are not bound by a panel decision made untenable by an intervening decision of the Supreme Court.

Even our decisions after *Bueno* belie the certainty claimed to have existed during this period. Obviously, cases decided after Matherne's termination do not bear directly on Wilson's knowledge. However, the post-*Bueno* cases demonstrate that, long after the firing, we were struggling with this "certainty." On April 25, 1983, for example, and shortly before Matherne's termination became effective, this court decided *McBee v. Jim Hogg County.*[25] There, three deputies and two field dispatchers employed by the Jim Hogg County, Texas sheriff's office brought suit against the newly elected sheriff alleging that in failing to reappoint them when he

---

**20.** *See id.* (citing *Elrod*, 427 U.S. at 366–71, 96 S.Ct. at 2686–89 (explicitly following *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973))).

**21.** *See McCormick*, 646 F.2d at 178 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

**22.** *McCormick*, 646 F.2d at 179.

**23.** 714 F.2d 484 (5th Cir.1983).

**24.** *Id.* at 495.

**25.** 703 F.2d 834 (5th Cir.1983) (vacated and remanded on rehearing en banc).

assumed office on January 1, 1981, the sheriff had violated their constitutional rights. Some of the plaintiffs alleged that they were dismissed because they had supported the incumbent sheriff in the election. We noted that the defendants had not challenged the district court's finding "that the rule and rationale underlying the *Elrod–Branti* doctrine applies when an employment decision is based upon support of and loyalty to a particular candidate as distinguished from a political party,"²⁶ but held that "we agree with the district court that the *Elrod–Branti* rule is applicable in cases such as this."²⁷ We held, however, that plaintiffs had failed to state an *Elrod–Branti* claim because they had not established that the sheriff's decision not to rehire them was based on their political activity.²⁸ We reversed the district court and found for the sheriff.

On August 12, 1983, however, we granted rehearing *en banc* of the *McBee* decision.²⁹ Rather than holding that the *Elrod–Branti* test was applicable to cases of political activity, the en banc court held that cases involving the conflict between "employee's speech and associational rights as citizen and the state's right as an employer to loyal and efficient service"³⁰ could be placed on a continuum. Cases such as *Elrod* and *Branti*, where an employee was discharged "on the sole ground of their private and—for employment purposes—all but abstract political views"³¹ would lie at one extreme; a case such as *Ferguson v. Thomas*,³² "where instructors had incited student disturbances that were sufficiently serious to call into question the ability of the academic authorities to main-

tain order on campus,"³³ would lie at the other extreme. We placed the facts before us in *McBee*, like the facts before us today, in the center of that continuum, with *Connick v. Myers*.³⁴ Thus, *McBee*, by no means disavowed *McCormick's* reading of *Elrod* and *Branti*.

This evolution of our case law further persuades us that Wilson is entitled to qualified immunity. With our court having granted en banc consideration of the rights of public employees to engage in political activity, we cannot say that the law would have been apparent to a reasonable sheriff in St. Charles Parish facing these facts. Thus, we hold that, in his individual capacity, Wilson was entitled to qualified immunity as a matter of law.

### III

Wilson and Marino also were sued in their official capacities, and because the protection of qualified immunity extends to an official only in his individual capacity,³⁵ we now turn to the points of error that survive a grant of qualified immunity.³⁶

### A

█ Wilson and Marino argue that a verdict should have been directed in their favor because Matherne failed to prove that the departmental political activity policy was unconstitutional. We have outlined the evolution of an employer's freedom to restrict employees' speech over twenty years of case law. A public employer may not require an employee "to surrender First Amendment rights as a condition of

26. *Id.* at 838 n. 1.

27. *Id.*

28. *See id.* at 844.

29. *See McBee v. Jim Hogg County*, 730 F.2d 1009 (5th Cir.1984). The en banc court reassessed the panel decision in light of the Supreme Court's then-latest pronouncement in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *See McBee*, 730 F.2d at 1013–15.

30. *McBee*, 730 F.2d at 1014.

31. *Id.*

32. 430 F.2d 852 (5th Cir.1970).

33. *McBee*, 730 F.2d at 1014.

34. *Connick*, 461 U.S. at 143, 103 S.Ct. at 1688.

35. *See Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985).

36. Because we hold that Wilson is entitled to qualified immunity and thus that he has no individual liability, we need not address his argument that he should not have been cast in his individual capacity.

employment";[37] however, an employee is not always free to speak as a private citizen.[38] In reviewing a § 1983 claim of retaliatory termination of employment, a court must strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees."[39]

This analysis has been refined.[40] A threshold inquiry is whether an employee's speech addresses a matter of "public concern"; only then can an employee wield the first amendment as a shield from termination. This is a question of law[41] "determined by the content, form, and context of a given statement, as revealed by the whole record."[42] Once past this threshold, the second inquiry is whether the employer was justified in firing the employee, a determination requiring "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public."[43]

Here, Wilson contends that a sheriff's office cannot efficiently perform its public duties without the personal, political loyalty of each of its employees to the sitting sheriff.[44] We have applied *Pickering* and *Connick* in situations similar to the case before us. In *McBee*, we held that a sheriff's interest in loyalty "would constitute a legitimate government interest in effective service only if loyalty to a particular candidate was necessary for the effective performance of the job."[45] We concluded that even the small size of an office would not require departure from our prior holding in *Barrett v. Thomas*[46] that political loyalty was not required for the effective performance of the duties of employees in a sheriff's office. We then delineated considerations for balancing the competing interests: whether the actions involve "public concerns;" whether " 'close working relationships are essential to fulfilling [the deputies'] public responsibilities;' " the time, place, and manner of the activity; and whether the activity can be considered hostile, abusive, or insubordinate.[47] To this the Supreme Court has added that an employer need not tolerate a remark that "impairs discipline by superiors or harmony among coworkers...."[48]

37. *Gonzalez v. Benavides,* 774 F.2d 1295, 1299 (5th Cir.1985) (citing *Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967)), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986).

38. *See Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) ("[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the citizenry in general.").

39. *Id.* at 568, 88 S.Ct. at 1734–35. *See also Rankin v. McPherson,* — U.S. —, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987) (quoting *Pickering* ).

40. *See Connick,* 461 U.S. at 146–54, 103 S.Ct. at 1689–94.

41. *See id.* at 148 n. 7, 103 S.Ct. at 1690 n. 7.

42. *Id.* at 147–48, 103 S.Ct. at 1690.

43. *Id.* at 150, 103 S.Ct. at 1692.

44. Wilson does *not* argue that his campaigning rule promoted police professionalism as typical civil service rules do. Nor did Wilson attempt to promulgate a non-partisan "good government" edict designed to divorce law enforcement from politics in St. Charles Parish. Instead, Wilson's rule evinced a sharp partisan purpose: All of his employees could work for his re-election, but none could work for the election of any of his opponents. Wilson can justify such a regulation only if he could demand personal loyalty from each of his employees.

45. *McBee,* 730 F.2d at 1015.

46. 649 F.2d 1193 (5th Cir.1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982), *modified on other grounds,* 809 F.2d 1151 (5th Cir.1987).

47. *See McBee,* 730 F.2d at 1016–17.

48. *Rankin,* — U.S. at —, 107 S.Ct. at 2899. *Rankin* implies that, depending upon the case, a court may consider other factors affecting the effective fulfillment of a governmental agency's mission. *Id.; see also id.,* 107 S.Ct. at 2901 (Powell, J., concurring) (concluding that fired employee's remarks did not "undermine the mission of the office"); *McBee,* 730 F.2d at 1016 (*Connick* requires us "to tailor the analysis to the particular facts of each case").

Then, in *Gonzalez v. Benavides,*[49] we explained that the balancing test is not all-or-nothing but rather a sliding scale under which "public concern" is weighed against disruption: "[A] stronger showing of disruption may be necessary if the employee's speech more substantially involves matters of public concern."[50]

Matherne argues that a person's choice of candidate in an upcoming election is a matter of public concern; that his activities were conducted off-premises and while off duty, and any disruption to the on-going business of the sheriff's office was slight. The argument continues that there was no evidence that a close working relationship was essential to the fulfillment of Matherne's duties.

We agree with Matherne. Matherne, as even Wilson admitted at trial, was subject to a strict chain of command overseeing his job performance. Matherne's job imposed upon him the professional duties of a peace officer, not the politically sensitive requirements of a confidential aide to a politically elected official. Nothing in the record suggests that Matherne's professional judgment would ever have been skewed by his political beliefs. Similarly, Wilson offers *no* evidence that Matherne's decision to oppose Wilson for re-election impaired Matherne's working relationships with his superiors or created *any* debilitating strife within the sheriff's office. On the contrary, Wilson suggests only one justification for firing Matherne: to prevent Matherne from abusively choosing which laws to enforce and whom to arrest so as to discredit Wilson. The evidence does not support such a conclusion.

■ There is some confusion in the record regarding the trial court's view of which party was to shoulder the burden of proving whether Wilson justifiably fired Matherne: The jury was instructed on the relevant considerations in balancing the public interest of Matherne's activities against the state's interest in departmental efficiency. The verdict form asked, "Do you find by a preponderance of the evidence that the defendants were justified in firing the plaintiff for his political activities or associations in order to prevent disruption in the operation of the sheriff's department?"[51] Yet, at the same time, the court stated, "The issue of whether the defendant, Sheriff Charles C. Wilson, was justified in firing the plaintiff, Leroy J. Matherne, to protect the effectiveness of the St. Charles Parish Sheriff's Office is a question of law for the court," and proceeded to enter its own findings of fact and conclusions of law on the subject. However, the confusion is not fatal, because even when we view the facts in the light most favorable to the sheriffs in their official capacities,[52] Matherne's activities were protected under the first amendment, and Wilson was not justified in firing Matherne for those activities.[53] Matherne was "a subordinate who ha[d] expressed a reasoned preference for another superior" not "an individual who ha[d] blackguarded [Wilson's] honesty and ability up and down the county."[54]

### B

■ Wilson argues that the district court erred in not holding a charge confer-

**49.** 774 F.2d 1295 (5th Cir.1985), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986).

**50.** *Id.* at 1302.

**51.** *Rankin,* — U.S. at —, 107 S.Ct. at 2898 ("The State bears a burden of justifying the discharge on legitimate grounds.").

**52.** *See Connick,* 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10 ("[W]e cannot 'avoid making an independent constitutional judgment on the facts of the case.'") (quoting *Jacobellis v. Ohio,* 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964)).

**53.** Occasionally, the state's burden to justify its actions may be as light as merely proving that the employer "reasonably believed the employee's speech was likely to disrupt its operations." *Gonzalez,* 774 F.2d at 1302. However, where, as here, "the employee's speech more substantially involves matters of public concern," the burden increases to require objective evidence of disruption. *Id. Cf. Rankin,* — U.S. —, 107 S.Ct. at 2901 n. * (Powell, J., concurring) ("no objective evidence" of disruption where employee fired for comment about President Reagan).

**54.** *McBee,* 730 F.2d at 1017.

ence before the final arguments as required by Federal Rule of Civil Procedure 51.[55] Failure to adhere to Rule 51, however, does not require a new trial when a party fails to object to the sequence or fails to show prejudice.[56] Matherne argues that Wilson consented to the sequence, waiving any objection to it. Moreover, Wilson states only that the sequence was "contrary to law and exposes the defendant to undue exposure without the ability of his counsel to properly gauge his closing argument in accordance with the facts and law presented by the court." While a fair statement of the purpose of Rule 51, it tells us nothing about how Wilson was prejudiced.

### C

▇ Wilson next raises several points of error attacking the jury charge and verdict form. We have decided that under the undisputed facts, Wilson is entitled to qualified immunity in his individual capacity, but that firing Matherne violated the first amendment. Implied in our discussion is the conclusion that this case properly could have been resolved on a motion for directed verdict; thus, contentions over the jury charge are battles of no relevance to the war.

### IV

### A

▇ Turning now to the damages issues, Wilson argues that the court erred in disallowing testimony about Matherne's receipt of unemployment compensation. He contends that, in effect, Matherne received "double recovery." Wilson cites to other circuits where offset for unemployment compensation is admissible.[57] In this circuit, however, whether to allow testimony of offset is within the discretion of the district court, and we find no abuse of that discretion.[58]

### B

▇ Finally, on cross appeal, Matherne argues that the court erred in reducing the jury's verdict without first offering him the option of retrial on the damages issue. The argument is misplaced. It is true that a plaintiff must be offered a choice between acceptance of a reduction in damages and a new trial.[59] Where a remittitur is ordered without offering the prevailing party the option of a new trial, we must remand to allow him to "exercise his rights of choice by requesting new trial in lieu of the remittitur."[60] However, nominal damages are not recoverable when actual injury is shown, and even then the award must be truly nominal.[61] The only error of the trial court was in not setting aside the entire award of "nominal" damages. Matherne's asserted error is without merit.

### V

In sum, Wilson is entitled to qualified immunity as a matter of law, and we REVERSE the judgment against him in his individual capacity. We AFFIRM the court's judgment in all other respects.

---

55. Rule 51 provides:
   The court shall inform counsel of its proposed action upon [requested jury instructions] prior to their arguments to the jury.

56. *See Kestenbaum v. Falstaff Brewing Corp.,* 575 F.2d 564, 574 (5th Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *see also* Wright & Miller, *Federal Practice & Procedure* § 2552 at 632 (1971) (noting that Rule 51 is "salutary").

57. *See Olshock v. Village of Skokie,* 541 F.2d 1254, 1260 (7th Cir.1976); *Wellner v. Minnesota State Junior College Board,* 487 F.2d 153, 157 (8th Cir.1973); *but see Brown v. A.J. Gerrard*

*Mfg. Co.,* 715 F.2d 1549, 1551 (11th Cir.1983) (disallowing admission of offset evidence as a rule); *Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77, 82 (3d Cir.1983) (same).

58. *See Merriweather v. Hercules, Inc.,* 631 F.2d 1161, 1168 (5th Cir.1980).

59. *See Higgins v. Smith International, Inc.,* 716 F.2d 278, 281 (5th Cir.1983).

60. *Id.*

61. *See Cary v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Russell v. Harrison,* 736 F.2d 283, 292 (5th Cir.1984).